UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS,<br><br>   Petitioner,<br><br>            v.<br><br>DISH NETWORK L.L.C.,<br><br>   Respondent. | No. 25-cv-04995 |

**APPLICATION OF AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS FOR THE FIXING OF AN <u>INTERIM LICENSE FEE FOR DISH NETWORK, L.L.C.</u>**

The American Society of Composers, Authors and Publishers ("ASCAP") hereby applies, pursuant to Section IX(F) of the Second Amended Final Judgment dated June 11, 2001 ("AFJ2"), for the fixing of an interim fee for the right to perform publicly musical works in the ASCAP repertory by DISH Network, L.L.C. ("DISH"), for the period beginning January 1, 2022. For the Court's convenience, a copy of AFJ2 is appended hereto.

<u>**Introduction**</u>

1. ASCAP is applying to this Court, pursuant to AFJ2, to ensure that DISH pays ASCAP's members for the right to perform publicly the members' copyrighted musical works via the DISH satellite, Sling TV and Sling Freestream services on an interim basis as the parties continue to negotiate the terms of a new final license for those services. DISH's ongoing failure to pay fair compensation causes harm to the many music creators whose works are being exploited by DISH. ASCAP's application is necessary because *DISH has not paid a single cent in license fees to ASCAP for performances of ASCAP's members' music since January 1, 2022*.

2.      ASCAP's most recent license with DISH expired by its own terms on December 31, 2021 (the "Prior License"). On December 23, 2021, just before the Prior License expired, DISH applied to ASCAP in writing for a new license effective as of January 1, 2022, as provided for by AFJ2. Since that date, although it has continued to transmit performances of ASCAP's members' music, DISH has been operating without a final ASCAP license, and, as noted above, has not paid any license fees to ASCAP.

3.      ASCAP has repeatedly requested that DISH pay interim license fees for its ongoing public performances of ASCAP's members' music as the parties continue their negotiations for new license terms. DISH, however, has refused to pay interim license fees that ASCAP believes are appropriate, or, indeed, any interim fees—an entirely unacceptable and inequitable situation that ASCAP seeks to remedy through this application.

4.      While AFJ2 provides a music user the "protection" of an interim license—by insulating it from potentially massive liability for copyright infringement—as it negotiates a final license fee with ASCAP, it also provides a mechanism whereby ASCAP or the music user may ask this Court to fix interim fees to be paid during the pendency of such negotiations. The Court routinely has done so in the past. *See, e.g.*, *United States v. Am. Soc'y of Composers, Authors & Publishers*, *In the Matter of YouTube, LLC*, 616 F. Supp. 2d 447 (S.D.N.Y. 2009) (setting interim fees); *United States v. Am. Soc'y of Composers, Authors & Publishers, In the Matter of The Nat'l Cable Television Ass'n*, 1999 WL 335376 (S.D.N.Y. May 26, 1999) (same).

5.      The setting of interim fees is necessary in this instance to ensure that—for the first time since 2021—ASCAP's members will receive compensation for DISH's public performances of their music. And so, pursuant to AFJ2, ASCAP requests that the Court set an interim license

fee rate for DISH at the same rates paid to ASCAP by similarly situated licensees operating in the same industry, including DISH's primary competitor, DirecTV.

## The Parties

6. Established in 1914, ASCAP is the nation's only performing rights organization ("PRO") that is a voluntary membership association operating on a not-for-profit basis. It is also the only U.S. PRO governed by the music creators whose music it represents. ASCAP's members now consist of more than one million songwriters, composers and music publishers, who are the creators and owners of the copyrights in more than 20 million musical works. On behalf of its members, ASCAP licenses, on a non-exclusive basis, the nondramatic public performances of their copyrighted musical works.

7. ASCAP's members are writers and publishers of every genre of music. Writers—songwriters, composers and lyricists—are the authors of the musical works that are the foundation of the music industry, in whom the musical copyright initially vests. Typically, the writers assign their copyrights to music publishers, who help songwriters create and market their works, in exchange for a share of the income derived from the use of those works. ASCAP distributes to its members all royalties collected for public performances of its members' musical work, less expenses and reasonable reserves; as a result, nearly 90 cents of every dollar collected by ASCAP is paid to its members as royalties.

8. Although many ASCAP members, including such iconic writers/performers as Beyoncé, Mariah Carey, Justin Timberlake, Stevie Wonder, Madonna, and the late Johnny Cash and Tom Petty, enjoy illustrious careers, the vast majority of ASCAP's members are not famous, award-winning performing artists and earn only modest royalties as songwriters. In fact, for many of ASCAP's songwriter members, the performance royalties received from ASCAP are their largest—if not, only—source of income from the use of their copyrighted music. This is especially

the case for ASCAP's many composer members who primarily create music for placement in movies, television programs, and advertisements; with the exception of a handful of film and tv composers who are world-renowned, like ASCAP member Hans Zimmer, they rarely, if ever, perform "live." Thus, ASCAP's most important task is to ensure that its members—whether or not they are household names—receive fair compensation for public performances of their music.

9. DISH, a wholly owned subsidiary of EchoStar Corporation ("EchoStar"), has for decades been the provider of satellite television services. Since 2015, it also has owned and operated—through its subsidiary, Sling TV Holdings, LLC—an "over-the-top" Internet Protocol television ("IPTV") service,[1] known as "Sling TV." According to documents publicly filed by EchoStar, DISH and Sling TV had a combined 7,778,000 subscribers in 2024.

10. DISH recently has expanded its offerings with the launch of "Sling Freestream," a free, ad-supported television ("FAST") service. Sling Freestream launched in or around February 2023, and now features more than 500 channels.

## Jurisdiction

11. This Court has continuing jurisdiction over the setting of reasonable license fees for the public performance of works in the ASCAP repertory pursuant to AFJ2. AFJ2 §§ XI, XIV, *United States* v. *Am. Soc'y of Composers, Authors & Publishers*, No. 41-1395, 2001 WL 1589999, at *9–11 (S.D.N.Y. June 11, 2001).

12. ASCAP commences this proceeding pursuant to Section IX(F) of AFJ2, which provides that "when a music user has the right to perform works in the ASCAP repertory pending the completion of any negotiations or pending proceedings provided for in Section IX(A) of this

---

[1] An IPTV service delivers television programming over the Internet instead of using traditional cable, satellite, or broadcast media.

Second Amended Final Judgment, either the music user or ASCAP may apply to the Court to fix an interim fee pending final determination or negotiation of a reasonable fee." AFJ2 § IX(F).[2]

13. Jurisdiction is therefore proper in this Court because: (i) DISH made a written application for a license pursuant to Section IX(A) of AFJ2 on December 23, 2021; and (ii) ASCAP and DISH have not yet been able to agree upon terms for a new final license for the DISH Services for the license term beginning January 1, 2022. Accordingly, ASCAP asks this Court to fix an interim license fee pursuant to Section IX(F) of AFJ2 until such time as a final license fee is agreed to by the parties or, if necessary, determined by this Court.

### Background Relevant to ASCAP's Request for Interim Fees

14. DISH generally exploits ASCAP members' rights of public performance in four separate ways: *First*, DISH operates a background music service through which audio-only content is made available to commercial subscribers, such as retail stores and restaurants, to enhance their business environments (the "Background Music Uses"). *Second*, DISH offers "pay per view" and/or "video on demand" services to its DISH and Sling TV subscribers (the "Pay-Per-View Uses"). *Third*, DISH programs, originates, or otherwise inserts audio-visual content for transmission to its DISH and Sling TV subscribers via: (a) channels that it owns and controls; (b)

---

[2] Before the Music Modernization Act (Pub. L. 115-264, title I, § 104, Oct. 11, 2018, 132 Stat. 3726) ("MMA") was enacted in 2018, applications pursuant to Section IX of AFJ2 were to be referred to the Judge then having jurisdiction over AFJ2—currently, the Hon. Denise Cote. The MMA altered that procedure, requiring instead that all such applications "shall be . . . randomly assigned to a judge" in the Southern District of New York other than the Judge to whom continuing jurisdiction over AFJ2 (or the similar BMI consent decree) is assigned or a Judge to whom another proceeding concerning an application for the determination of a reasonable license fee is assigned at the time of the filing of the application. *See* 28 U.S.C. § 137(b). Currently, three such proceedings are pending before Judges Cronan, Ho and Failla. *See Radio Music License Committee, Inc. v. Broad. Music, Inc.*, 1:22-cv-05023-JPC-SDA; *Radio Music License Committee, Inc. v. Am. Soc'y of Composers, Authors and Publishers*, No. 1:23-cv-07228-DEH; *Broad. Music, Inc. v. Sirius XM Radio LLC f/k/a Sirius XM Radio Inc.*, 1:24-cv-06896-KPF.

ads inserted by DISH in content that is transmitted on channels owned and controlled by third parties and distributed via the DISH satellite and/or Sling TV services[3]; and (c) announcements, promotional materials, or other content inserted in, or included on, DISH and Sling TV's home or menu screens and program/channel guides or other similar such guides (collectively, the "Linear Content Uses").  And, *fourth*, DISH programs, originates, or otherwise inserts audio-visual content for transmission to Sling Freestream subscribers via:  (i) FAST channels that it owns or controls, if any, and (ii) ads inserted by DISH in content that is transmitted on FAST channels owned and controlled by third parties, and distributed via Sling Freestream; additionally, DISH would be responsible for licensing performances of ASCAP's members' music on any FAST channels made available via the Sling Freestream service for which the channel operators are not otherwise properly licensed by ASCAP[4] (collectively, the "Freestream Uses" and together, with the Background Music Uses, Pay-Per-View Uses and Linear Content Uses, the "Licensable Uses").

15.     Since the expiration of DISH's Prior License on December 31, 2021, DISH and ASCAP have attempted to negotiate a new final ASCAP license for the DISH Services that accounts, and compensates ASCAP's members, for each of DISH's Licensable Uses of copyrighted music.  ASCAP understands and believes that the parties have reached an agreement regarding the fees to be paid for DISH's Background Music Uses and Pay-Per-View Uses.  DISH

---

[3]   It is common practice that "carriage" agreements between channel operators, on the one hand, and cable or satellite system operators, on the other hand, will include as part of the consideration for carrying the tv channel(s) owned and operated by the channel operator contractual provisions permitting the cable or satellite system operator to sell and insert advertisements in a certain amount of the programming aired on the channel(s).

[4]   The owners and operators of many, but not all, FAST television channels also own and operate traditional pay television (*i.e.*, cable) channels and are licensed by ASCAP on a "through-to-the-audience basis."  For example, in addition to operating various cable channels, A&E Television Networks also owns and operates several FAST channels; A&E's license with ASCAP permits A&E to transmit content incorporating members' music on both its cable and FAST channels or services.

and ASCAP, however, still have not reached an agreement regarding the appropriate fee for DISH's Linear Content Uses or Freestream Uses.

16.　　As noted previously, despite its ongoing exploitation of ASCAP's members' music, and despite the parties having agreed in principle on the fees to be paid for Background Music and Pay-Per-View Uses, DISH has not paid any interim license fees to ASCAP for any of its Licensable Uses, for the period January 1, 2022 to date.

**Facts Relevant to the Setting of an Appropriate Interim Fee for Linear Content Uses**

17.　　ASCAP and DISH have exchanged various license fee proposals for DISH's Linear Content Uses. But the parties remain far apart, and ASCAP can no longer countenance DISH's ongoing performance of its members' music without compensation as negotiations drag on.

18.　　ASCAP has asked DISH to pay interim fees for its Linear Content Uses at the same rates that *all similarly situated licensees in the cable television and satellite television industries are paying ASCAP for similar uses*. Those rates were specifically negotiated at arms-length between ASCAP and NCTA (formerly known as the National Cable & Telecommunications Association), a trade association representing the broadband and cable television industries in the United States. And those rates are the same rates that are offered to every cable system operator in the United States that is licensed by ASCAP, as well as DISH's sole direct competitor in the satellite television industry, DirecTV (the "Cable/Satellite System Licensees").

19.　　Moreover, cable system operators—whether operators that control multiple systems across the country, such as Xfinity, Spectrum, and/or Cox Communications, or smaller regional providers—provide the same services as, and throughout most of the country are in direct competition with, DISH and DirecTV. All are classified as "Multichannel Video Programming Distributors" (MVPDs), which simply means that they operate platforms through which they distribute bundled television channels for purchase to consumers (or "subscribers") via cable,

fiber, or satellite. DISH's satellite television service is considered a traditional MVPD. Sling TV would be considered a "virtual" MVPD because, rather than delivering its bundled channels to subscribers via cable, fiber or satellite, Sling TV delivers those channels via the Internet. The precise bundle of channels may differ from distributor to distributor, but the content available to a subscriber on a particular channel is identical no matter how it is delivered to the subscriber. In other words, whether a subscriber is a customer of DISH or a cable service like Spectrum, the content available on ESPN, for example, is identical.

20. ASCAP's Cable/Satellite System Licensees are billed a modest, flat per-subscriber annual fee for their linear content uses (the "Per-Subscriber Rate").[5] The Per-Subscriber Rate permits Cable/Satellite System Licensees to transmit content incorporating ASCAP's members' music that the Cable/Satellite System Licensee programs, originates or otherwise inserts: (a) in channels that it owns and operates and (b) in television ads that it inserts on channels that are owned and controlled by third parties and distributed by the licensee. These are identical uses to the Linear Content Uses for which DISH requires a license.

21. The Per-Subscriber Rate paid by ASCAP's Cable/Satellite System Licensees is fixed. It does not vary depending on either the amount of content inserted by the licensee or the amount of ASCAP music in that content. Nor does it vary based on the size of the licensee's subscriber base—small-market cable system operators pay the same Per-Subscriber Rate as large-market cable system operators and satellite television providers—or the fees that subscribers pay

---

[5] The rates paid by Cable/Satellite System Licensees during the relevant time frame (from January 2022 forward) are confidential and span two different license terms. The rate for calendar year 2022 was set forth in a license agreement that expired as of December 31, 2022; the current rate (applicable to years 2023 through 2027) is contained in the current agreement between the parties. Upon the entry of a protective order in this matter, ASCAP will be able to disclose those rates to the Court.

to their applicable service providers (*i.e.*, the Per-Subscriber Rate is identical regardless of whether the subscriber subscribes to a "basic" tier or a "premium" tier of service).

22. There are a handful of Cable/Satellite System Licensees, including DirecTV and a number of the largest national cable suppliers, that, like DISH, operate both a traditional MVPD service as well as a virtual MVPD service. To be clear, each of those licensees pays to ASCAP the same Per-Subscriber Rate for its linear content uses for both MVPD and virtual MVPD subscribers.

23. That DISH should pay interim fees based on the Cable/Satellite System Per-Subscriber Rate is not controversial. Rather, it is entirely consistent with the provisions of AFJ2, which directs the Court, in determining an appropriate interim fee, to presume that ASCAP's licenses with similarly situated music users set forth an appropriate fee. AFJ2 § IX(F).[6] It is also consistent with Rate Court jurisprudence, which requires fees to be set at fair market rates, approximating "the rates that would be set in a competitive market." *Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 576 (2d Cir. 1990).

24. ASCAP does not at this point concede that the Cable/Satellite System Per-Subscriber Fee constitutes a reasonable "final" fee for the DISH Services. This is because the content inserted by DISH on the DISH-controlled TV channels appears to be more music-intensive than the content inserted in similar channels by other Cable/Satellite System Licensees. In particular, DISH advertises that its "DISH Studio" channel, which it owns and operates, includes

---

[6] The pertinent language of Section IX(F) is as follows: "In fixing such interim fee, there shall be a presumption that the last existing license (if any) between the music user and ASCAP, or between licensees similarly situated to the music user and ASCAP, sets forth the appropriate interim fee." Here, however, the terms and conditions—and, in particular, the payment provisions—of DISH's Prior License likely preclude its use in fixing the interim license fee. As the Prior License also contains a confidentiality clause, ASCAP will be able to provide a copy to the Court as soon as a protective order is entered.

broadcasts of, among other things: "concerts," "commercial free movies," and "full-length [television] shows." ASCAP has, on several occasions, requested information from DISH to enable ASCAP to assess the scope of music use in such content; to date, DISH still has not provided the requested information. To the extent such use is meaningfully above industry-standard, ASCAP reserves the right to seek higher final fees from DISH whether through negotiation or, if necessary, through a separate application to this Court for a determination of final fees.

25. Nor is there any basis for DISH to pay ASCAP license fees that are lower than the Per-Subscriber Rate. Like ASCAP's Cable/Satellite System Licensees, DISH (i) supplies television content to subscribers via systems that it owns, controls, and operates; (ii) programs, inserts and/or originates audio-visual content incorporating music on tv channels that it owns, controls, and operates; and (iii) inserts advertisements incorporating music on channels owned and controlled by third parties that are carried on the DISH Services.

26. The primary arguments ASCAP believes DISH is likely to make as to why it should not pay the industry standard Per-Subscriber Fee for its Linear Content Uses of ASCAP music simply make no sense.

27. As to content originated by DISH or inserted by DISH on DISH-controlled television channels, DISH may claim that its content providers have cleared all rights necessary to authorize DISH to transmit such content. To be clear, however, ASCAP does not authorize content providers to permit other entities to transmit content including ASCAP's members' music, nor does it permit its licensees to sublicense to other entities the rights they have obtained from ASCAP. In other words, ASCAP's agreement with, for example, Home Box Office, Inc. ("HBO"), authorizing HBO to transmit content incorporating ASCAP's members' music on tv channels and

other services operated and controlled by HBO, does not also permit HBO to authorize DISH to transmit that content on tv channels owned and operated DISH (*e.g.*, the DISH Studio Channel). The only parties that can authorize DISH to publicly perform ASCAP's members' music via transmission on the DISH-controlled tv channels are ASCAP's members who own the copyrights in the music, or ASCAP as its members' duly authorized licensor. Therefore, unless DISH or its content partners have cleared the public performance rights in *every single composition* owned in whole or in part by an ASCAP member that has been transmitted on the DISH-controlled tv channels since January 1, 2022, via a direct license with the ASCAP member(s) who own that copyright, DISH *must* license that content through ASCAP.

28. With respect to DISH's ad inserts, DISH may claim either that such inserts do not include ASCAP's members' copyrighted music or that, if they do, its ad-content partners have cleared all necessary rights of public performance. As to the former claim, it is a virtual certainty that ads inserted by DISH include copyrighted music owned and/or controlled by ASCAP's members. This is because music routinely is included in television advertising, including both "popular" music as well as music that is created specifically for ad campaigns (so-called "jingles"). As to the latter claim, ASCAP does not license the right to publicly perform its members music to ad suppliers. Again, the only parties that have the right to license the public performance of ASCAP's members' music in advertisements are ASCAP and its members. And so, as above, unless DISH or its ad suppliers have entered into direct licenses with ASCAP's members who own the copyrights in the compositions that are incorporated in its ad inserts, DISH *must* license that content through ASCAP.

29. Lastly, if DISH asserts that it is different than other Cable/Satellite System Licensees, this, too, fails to pass muster, for the reasons stated above. Thus, there really can be no

dispute that DISH should pay license fees at the same rate as all other similarly situated licensees on an interim basis as the parties explore whether DISH, in fact, should be paying a higher rate as a result of its music-intensive uses.

**Facts Relevant to the Setting of an Appropriate Interim Fee for Freestream Uses**

30. A well-established market exists for the public performances of music on FAST services, such as Sling Freestream. Such services typically pay ASCAP license fees at a standard, uniform rate calculated as a small percentage of gross advertising revenues.[7]

31. There is no rationale under which Sling Freestream should pay any other rate.

**ASCAP's Request for an Interim Fee Pursuant to AFJ2**

32. Under Section IX(E) of AFJ2, where, as here, a music user submits to ASCAP a written request for a license for the right of public performance, "[p]ending the completion of any such negotiations or proceedings, the music user shall have the right to perform any, some or all of the works in the ASCAP repertory to which its application pertains . . ." AFJ2 § IX(E). However, a music user's right to perform ASCAP's members' music in such circumstances also is subject to the provisions of Section IX(F) of AFJ2 which provides, in relevant part:

> [P]ending the completion of any negotiations or pending proceedings provided for in Section IX(A) of this Second Amended Final Judgment, either the music user or ASCAP may apply to the Court to fix an interim fee pending final determination or negotiation of a reasonable fee. The Court *shall then fix* an interim fee within ninety (90) days of such application for an interim fee retroactive to the date of the written request for a license, allowing only such limited discovery, if any, that the Court deems necessary to the fixing of such interim fee.

AFJ2 § IX(F) (emphasis added).

---

[7] The actual percentage rate is confidential and will be disclosed to the Court upon entry of a protective order.

33. Moreover, and as noted above, pursuant to Section IX(F) of AFJ2, in setting an interim fee, the Court is to presume that "the last existing license (if any) between the music user and ASCAP, *or between licensees similarly situated to the music user and ASCAP*, sets forth the appropriate interim fee." AFJ2 § IX(F) (emphasis added).

34. In light of the foregoing, and pursuant to AFJ2 § IX(F), DISH should pay interim fees for its Linear Content Uses at the same rate that is paid for such uses by all licensed cable system operators and DISH's primary competitor, DirecTV. Similarly, DISH should pay interim fees for its Freestream Uses at the same rates paid by other ASCAP-licensed FAST services.

**Relief Requested**

35. ASCAP respectfully requests, pursuant to Section IX(F) of AFJ2, that the Court fix interim fees for DISH for periods beginning January 1, 2022: (i) for DISH's Background Music Uses and Pay-Per-View Uses, at the rates previously agreed to by the parties; (ii) for DISH's Linear Content Uses, at the Per-Subscriber Rate paid by ASCAP's Cable/Satellite System Licensees, including DISH's primary competitor, DirecTV; and (iii) for DISH's Freestream Uses, at the same percentage-of-revenue rate paid by all similarly situated licensees.

Dated: New York, New York
        June 13, 2025

Respectfully submitted,

**AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS**

By: */s/ Richard H. Reimer*

RICHARD H. REIMER
JACKSON WAGENER

ASCAP
250 West 57th Street
New York, NY 10107
Phone: (212) 621-6000
rreimer@ascap.com
jwagener@ascap.com

*Attorneys for American Society of Composers, Authors and Publishers*